# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | | |
|---|---|---|---|
| **CODY COFER,** | ) | | |
| | ) | | |
| **Petitioner,** | ) | | |
| | ) | | |
| **v.** | ) | **No.** | **3:16-cv-671** |
| | ) | | **REEVES/POPLIN** |
| **RANDY LEE, Warden,** | ) | | |
| | ) | | |
| **Respondent.** | ) | | |

## MEMORANDUM OPINION

Petitioner Cody Cofer has filed a federal habeas petition pursuant to 28 U.S.C. § 2254 challenging his State-court judgments of conviction for two counts of felony murder and one count of attempted especially aggravated robbery. Having considered the submissions of the parties, the State-court record, and the law applicable to Cofer's claims, the Court finds that the petition should be denied.

## I.    SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

The Tennessee Court of Criminal Appeals ("TCCA") summarized the pertinent facts of this case as follows:

> This case arises from the Defendant's participation in a home invasion that resulted in the shooting deaths of two victims, Keith Patton and William Asher. Several individuals participated in this home invasion to varying degrees, including: the Defendant, Joshua Hutson, Alexander Carino, and Amanda Spence. For his role in these crimes, a Cumberland County grand jury indicted the Defendant for two counts of felony murder and one count of attempted especially aggravated robbery.
>
> At the trial on these charges, the parties presented the following evidence: Tyler Rhinehart testified that, in November 2008, he was fourteen years old. Rhinehart said that he knew both victims in this case: Patton was a family friend and Asher employed him to clean out horse stalls at Asher's farm. Rhinehart recalled that, on November 7, 2008, a group of people that included both Patton and Asher met at Cancun's restaurant in Crossville to celebrate Rhinehart's father's birthday. After the dinner and on the drive home, Rhinehart's father stopped at Patton's home in Crab Orchard to use the restroom. Rhinehart said that he entered Patton's home and

sat down in a chair in the living room while he waited for his father. Rhinehart described the other people in the room and their locations, saying that Jackie Garrison, his stepmother's father, and Asher were seated on the couch, Patton was seated in a rocking chair, and Michael, a boy his stepmother Angie cared for, sat in a chair "on the other side of the room." Rhinehart said that "other people" in the residence were in the back bedroom.

Rhinehart testified that, as he sat in the living room talking with the others, two men wearing black masks and carrying guns entered the room and demanded money. Rhinehart recalled that as Patton walked toward the two men, telling them to "get out of his house," the two men began shooting. Rhinehart described the first man who entered the living room as "a little bit taller than the second." Rhinehart recalled that the first man carried an AK47 assault rifle with a loaded clip and one clip attached to the gun. The second man carried a pistol. He said that he did not see the man with the pistol actually fire the gun because he was focused on protecting himself from the gunfire. Rhinehart said that, to his knowledge, Patton did not have a weapon at the time of the shooting.

Rhinehart testified that he laid down on the floor and, after the gun fire stopped, the man carrying the pistol put the pistol up against Rhinehart's head and told him to "get off the phone." Rhinehart sat up and told the man he did not have a phone. The man carrying the AK47 walked into the adjoining kitchen, toward the back bedroom where Rhinehart could no longer see him. Rhinehart recalled that Patton was lying on the floor next to him, and he could see Patton's gunshot wounds. Asher, who was still seated on the couch, was "leaned back" with his leg on the rocking chair breathing heavily like he was "trying to get air." At some point after the shooting, Rhinehart saw a third man, who wore a black mask with a white "skeleton type" design on it, stick his head through the door "like [he was] trying ... to figure out what was going on." The man carrying the pistol pushed the third man out of the doorway and told him to "get out there and watch out."

Rhinehart testified that he heard a truck outside and one of the gunmen yelled "it's the boys," and the two men ran out of the house. Shortly thereafter, a friend of Patton's appeared at the door and asked to see Patton. When he saw Patton lying on the floor he walked over and began checking on him. Meanwhile Rhinehart heard a small four-cylinder vehicle, possibly a Kia, start up outside. Rhinehart recalled that his stepmother, Angie, called 911 and his father instructed Jackie Garrison to leave with Rhinehart and Michael "in case somebody came back."

On cross-examination, Rhinehart agreed that, early on the morning after the shooting, he told police that the man who first entered the living room carrying the AK47 was "about six foot tall, slim build and talked with a thuggish accent." Rhinehart also told police that the second man who entered the living room carrying the pistol was "about five foot two inches and skinny," dressed similarly to the first except he wore "gray tennis shoes with drawstrings." About the third man who had been standing outside, Rhinehart described him to police as "about five foot one

inch" tall and "kind of fat." He said this man was "wearing a black hooded jacket, black toboggan, black and white skeleton motorcycle mask covering his head and face[,]" and black gloves. Rhinehart testified that he could not tell the race of the three men because all three men were "pretty well covered."

Jackie Garrison testified that his daughter, Angie, is married to Rhinehart's father. Garrison said that he knew both of the victims in this case. Garrison recalled that, on the night of November 7, 2008, he went to Cancun restaurant in Crossville to celebrate his son-in-law's birthday. Garrison said that, after the dinner and on the drive home, Angie asked him to stop at Patton's house, so she could use the bathroom. Garrison stopped, and Patton invited them inside to visit "for a little while." Garrison said that he was inside Patton's home for about five minutes when two men entered the living room and demanded money. Garrison described the first man who entered the room as tall and the second man as "a little shorter." He recalled that both men were dressed in black and wearing gloves and masks. The taller of the two men carried an assault rifle with a clip in it and the shorter man carried a black pistol. Garrison clarified that it was the first man who entered the room that demanded money. In response to the demand, Patton stood up from his chair and began walking toward the men telling them to get out of his home. When Patton was approximately six to eight feet from the men, the intruders began firing their guns.

Garrison testified that he never saw the man with the pistol actually fire his gun. He explained that after the man carrying the assault rifle began shooting, he put his head down and began praying. He also said that, to his knowledge, Patton did not have a weapon at the time of the shooting. After the gunfire ceased, the taller man carrying the assault rifle ran toward the back bedroom while the man carrying the pistol remained in the living room and kitchen looking through drawers and cabinets. Garrison recalled that he could see Patton lying on the floor bleeding and that Asher, who was next to him on the couch, was making gasping sounds. Garrison asked the man carrying the pistol if he could help Asher, and the man replied, "if you move, ... you won't need no help either." Garrison interpreted the statement to mean that the man would shoot Garrison if he attempted to help Asher.

Garrison testified that, as soon as the two shooters left the house, he immediately took "the two young boys," Michael and Rhinehart, away from the premises. Garrison testified that he did not see a third person, only the two shooters. Garrison said that, based on his location in the living room, he could not see out the door.

On cross-examination, Garrison said the second man who entered the living room was substantially shorter than the first man who entered the room, estimating the height differential to be between four and six inches. Garrison said that he did not notice anything distinct about the two shooters' speech and that he did not know their race because both men were well covered.

Garrison recalled that a heavyset man came to the door after the two shooters had left. Garrison believed the man's name was "Reed." Garrison told the man to go get help, and the man got in his truck and left.

Blake Reed testified that he had been friends with Patton since the two were in high school. Although Reed did not know Asher personally, he lived near Asher and "knew of him." Reed recalled that he stopped by Patton's home at about 9:30 on the night of November 7, 2008. When he pulled in the driveway, he noticed a black car parked in the driveway with round tail lights "stacked side by side." Reed identified a photograph of a black Kia that belonged to the Defendant's friend, Autumn Hale, as looking "similar" to the one he saw the night of the shooting. Reed said that he emerged from his truck and had stepped up on the porch when "a man came busting out of the house." Reed said that he could not make out any distinguishing features but noted that the man wore dark clothes. The man told Reed to "get the f* * * in the house." Because there was no light outside the house, Reed could not see what the man was holding but believed it to be a gun. Reed walked in the house and saw Patton lying on the floor. Garrison, who was seated on the couch, asked if the men were gone. Reed heard tires spin and gravel spewing outside and responded that the men were gone.

Joshua Hutson, a co-defendant in this case, testified that he had known the Defendant almost his whole life and that he met Alexander Carino, another co-defendant, about five months before the shooting. Hutson said that he and Carino discussed the potential of committing a robbery and that he agreed to participate. Hutson recalled that, on November 7, 2008, he spent most of the day at home. In the evening, his girlfriend at the time, Anna Claire Daniels, drove him to meet the Defendant and Carino at a Taco Bell in Oak Ridge, Tennessee. Hutson said Carino drove the three men in a "dark colored four door Kia" to Cumberland County. Hutson said that Daniels was not "involved in any plan" but that she knew the three men were going to rob someone. Hutson said that Daniels "probably [did] not" agree with what he was doing but that she did not tell Hutson not to go.

Hutson testified that, on the way to Cumberland County, the men stopped at the Defendant's home for the Defendant to retrieve black clothing. The Defendant also purchased gloves at a gas station for the Defendant and Hutson. Hutson said that all of the men dressed similarly, although Hutson's mask had a camouflage pattern covering the bottom portion of the mask. Once the men arrived in Cumberland County, they drove down Highway 70 looking for the "right home." Carino was not sure which home was Patton's, so he called Amanda Spence, who knew the location of Patton's home, but she did not answer her phone.

Eventually, Spence returned Carino's call, and the men drove to Spence's home. Hutson said that he had only met Spence one time previously. Hutson recalled that Carino, the Defendant, Spence, and a friend of Spence's were all present when they discussed the robbery. Spence provided the men with a diagram of the layout of the residence. Spence then went with the men to "scout[ ] the place out." Hutson said

they had guns in a bag in the trunk of the Kia. After returning to Spence's house, Hutson took the driver's seat and drove the men to Patton's home where he stopped in front of the neighbor's driveway. The Defendant and Carino got out of the Kia with guns and walked toward the residence, while Hutson drove down the street and then back past Patton's home, ultimately parking in the driveway.

Hutson testified that, before Carino and the Defendant went into Patton's home, he and Carino placed their cellular phones and keys in the glove compartment of the Kia. The State produced, and Hutson identified, both his and Carino's cellular phones. Hutson recalled that, after he parked in Patton's driveway, he got out and walked around to the front of the car. Carino instructed Hutson to turn off the headlights, and Hutson did so. Hutson said that Carino was standing at the corner of the house closest to the door while the Defendant was on the other corner. Carino entered the house first, carrying an assault rifle, and then the Defendant entered, carrying a handgun. Hutson said that he stood beside the driver's side door as the men entered the home. Almost immediately, Hutson heard "rapid gunshots," so he reached in the glove compartment, grabbed the cellular phones and keys, and ran to the front porch. When he looked in the residence he saw someone sitting on the couch "that stared directly back at [him]," a man lying on the floor, and the Defendant standing with the pistol drawn. The Defendant told Hutson to "keep a lookout," so Hutson ran back to the driveway. Within a minute, another car pulled into Patton's driveway, and Hutson fled.

Hutson described himself as "pretty scared" at the time. He then apologized to the families of the victims and said that "not a day goes by that I don't wish things were different and wish that I could turn back time." Hutson said that he felt responsible for his role in these crimes.

Hutson testified about his flight into the woods. He said that he was unfamiliar with the area and quickly became lost, so he tried to call Daniels, who did not answer her cell phone. He said that he spoke with the Defendant, who was with Carino, several times and learned that both men had left Patton's home and that Spence would pick Hutson up. Hutson recalled that he exited the woods looking for Spence twice. The first time he left the woods he saw a police car and the second time he saw a white pick-up truck. The white pick-up truck stopped and a woman got out of the truck with a shotgun and told Hutson to lie on the ground. Hutson said that he complied, and the woman waited there until police arrived and Hutson was taken into custody. Hutson said that, during his flight through the woods, he threw out a .22 caliber derringer, the gloves, the mask, and he lost a shoe close to the road where he was arrested.

Hutson testified that he did not take responsibility initially and lied to investigators. Hutson explained that he did so because he was scared of possible retaliation. Hutson told investigators what they already knew and what he thought they might believe because he was "really overwhelmed with the whole situation." Hutson agreed that he was charged with the same crimes as the Defendant and that he hoped

for some form of leniency for his testimony. Hutson denied that the State had made any promises as to his potential sentence. Hutson said that he was not testifying because he wanted a "get out of jail free card" but because he believed it was important for him to take responsibility for his actions by telling the truth. Hutson said that he had not spoken with Carino, the Defendant, or Spence since the shooting.

On cross-examination, Hutson agreed that he had bought and sold marijuana and cocaine. Hutson said that "marijuana was being smoked" during the afternoon and evening of the robbery. Hutson confirmed that his conversations about the robbery, prior to its occurrence, were with Carino and not the Defendant. Carino told Hutson that Spence knew someone they could rob. Hutson again confirmed that Daniels, who drove him to meet Carino and the Defendant, knew that the men were going to Cumberland County to rob someone. Hutson agreed that, if he had returned with money, Daniels would have benefitted from it. Hutson also agreed that Daniels never tried to discourage him from participating. Although Daniels knew Hutson owned a .22 caliber pistol, she did not know that he took the gun with him or that the two other men took guns.

Amanda Spence, a co-defendant, testified that she had known Alexander Carino since she was fifteen and that his nickname was "Reno." She said that she did not meet the Defendant until the night of the shooting. Spence explained that, at the time of these events, Carino was her drug source for cocaine and occasionally marijuana. Spence recalled that Carino told her that he needed to "hit some lick." Spence explained that "hitting a lick" meant "[t]o rob someone." She said Carino asked her if she knew anyone he could rob, and she told him she did not. At the time of this conversation, other people were present at Spence's home, so Carino talked with "a couple other guys" about a specific place he could rob. Spence admitted that she played a role in relaying information from "the guys" to Carino about Patton's home as a potential robbery hit. Spence said that she did not know Patton, but she became familiar with where he lived through the course of these events.

Spence testified that she was in the process of moving on November 7, 2008, when she received several phone calls from Carino to her cellular phone. Spence returned Carino's phone calls, and he told her he was waiting for her at her house. Carino also texted Spence on that day telling her to "go by" Patton's residence to "see who was there and what was there and what it looked like." Spence said that she did not go to Patton's home and, instead, lied to Carino, telling him that she had gone by Patton's home. Spence explained that she lied to Carino to "pacify him" because he called repeatedly and would not "take no for an answer." Spence said that she did not believe that Carino was serious about the robbery because he "always talked about things like this and never actually went through with a lot of things that he talked about."

Spence testified that, after speaking with Carino on the phone, she went home where she found Carino in a black four-door vehicle with the Defendant and Hutson. Spence identified a black Kia in the State's photograph as looking like the car she saw the three men driving. Spence said that she repeated the same information to Carino about Patton's home and then gave him the directions to the house. Spence said that she asked Carino to take her to the store and, as they were preparing to leave, the Defendant brought a bag into her home. Spence asked Carino what was in the bag, and Carino told her that guns were in the bag.

Spence testified that, after leaving her residence, they drove by Patton's residence, which was dark. They returned to Spence's residence, where the three men took the bag of guns and left. Thirty minutes to an hour later an "865" number that Spence did not recognize displayed as an incoming call to her cellular phone. Spence answered the phone, and the Defendant yelled at Spence that "things didn't go the way they were planned." The Defendant instructed Spence to go and get Hutson who was still at Patton's residence. Spence said that she recognized the voice on her cellular phone as the Defendant's voice because he had a "distinct accent" that is "really ghettoish." The Defendant hung up on Spence, so she tried to call Carino, but Hutson answered the phone. Hutson told Spence he was "in the woods" and did not know his specific location. Multiple phone calls were exchanged between Spence, Hutson and the Defendant. Spence described the flurry of phone calls as a "panic type situation." Ultimately, Spence said that she left her home to try and find Hutson.

Spence testified that, when she drove by Patton's residence, she saw an ambulance, fire trucks, police officers, and a helicopter. Spence recalled that she talked with Carino and told him about all the emergency personnel at Patton's residence and that she saw police arresting Hutson. Spence said that she did not know exactly where the Defendant and Carino were at that time but that, earlier, Carino had told Spence they were going back to Knoxville.

Spence testified that law enforcement came to her home the following day and gave her a copy of a search warrant. The officers also told her that she was under arrest. Thereafter, investigators interviewed Spence and, initially, she lied. Spence explained that she lied because she was told to do so, and she was scared. As the investigators began to present various pieces of evidence to Spence, she began telling the truth.

Spence testified that she had a drug problem in November 2008. She said that she used marijuana, Xanax, Percocet, and "Hydros." Spence acknowledged that, before the shooting, she had been charged with delivery of more than .5 grams of cocaine and that she was currently serving a six-year sentence on an unrelated conviction. Spence agreed that she was also charged for these offenses. She said that she hoped that her testimony would result in a more lenient sentence but that the State had not promised her anything in exchange for her testimony.

On cross-examination, Spence testified that the two men who provided her with information about Patton were Mike Fisher and Jason Coy, who bought large quantities of drugs from Patton. Spence denied ever buying marijuana from Patton and maintained that her drug source was Carino. Spence agreed that she was "high on marijuana that night" but denied any cocaine use that evening. She said that, despite the marijuana use, she had a clear recollection of the events. Spence said that she did not believe Carino knew Patton at all. Spence testified that a friend, Allison Pinson, was with her when she returned to her home and found Carino along with Hutson and the Defendant on the night of the shooting. Pinson also drove Spence to pick up Hutson because Spence did not have a valid driver's license. Spence agreed that she was also on house arrest at the time.

Anna Claire Daniels testified that she had known Hutson since the two were in sixth grade and were dating at the time of these events. Daniels said that she also knew Carino, through Hutson, and the Defendant, with whom she went to kindergarten. Daniels testified that, on the day of the shooting, she and Hutson spent the morning and afternoon together. At some point, she drove Hutson to a Taco Bell in Oak Ridge, Tennessee to meet the Defendant and Carino. Daniels said that she returned to Knoxville while the three men planned to drive to Crossville in a black Kia. She said that "they had bad intentions" to "settle a dispute." Hutson and Daniels had contact after she dropped him off at the Taco Bell, but Hutson became "very short" and evasive as to where he was and what he was doing. Daniels said she sent a text message to Hutson, but he did not respond. Daniels said that she fell asleep at her home and, when she woke up around 11:30 p.m., she noticed she had missed several phone calls from Hutson at around 10:30 p.m. Daniels said that she suspected that "something wasn't right" when she returned Hutson's phone calls, and Hutson's cellular phone was turned off. Daniels said she then called Carino's girlfriend, Ashley Snow, and learned that the men needed a ride.

Daniels testified that she, along with Snow and one of Snow's friends, drove to a BP gas station in Solway, Tennessee, to meet Carino and Hutson. When she arrived, however, she found Carino and the Defendant. When she inquired about Hutson, she was told "they've got him." She later learned that Hutson was not there because he had been arrested. Carino and the Defendant began taking items out of the vehicle they had been driving, a red Explorer, and placing the items in Daniels car. Daniels said that Carino got into her car, and the Defendant left. As Daniels drove back to Hutson's apartment with Carino, Snow, and Snow's friend, she began to understand what had occurred based on the conversation in the car. Daniels recalled that she turned onto a side road in Karns by a baseball field, and Carino got out of the car. Daniels said that she was instructed to turn the car around. She did so and when she returned to where Carino had exited her car, she saw his shoes burning on the side of the road. Carino got back into the car, and Daniels drove to Hutson's apartment.

Daniels testified that, as the night progressed, she grew more concerned about Hutson and what had occurred in Cumberland County. The following day, she

contacted police and provided information about Carino's location, and he was later arrested. Daniels said that she also gave a statement to police and assisted Agent Calahan in finding the area where Carino burned his shoes. Daniels testified that she and Hutson were no longer in a relationship, although she had spoken with him "a couple of weeks ago."

On cross-examination, Daniels agreed that Hutson was the source of most of the information she provided to police. From Hutson, she had learned that the three men were going to "see about marijuana and possibly fifty thousand dollars." Daniels said that she dropped Hutson off at a Taco Bell to meet Carino and the Defendant at 6:30 or 7:00 p.m. eastern time. Daniels said that she met the Defendant and Carino at the BP gas station at around midnight eastern time.

Jason Legg, a TBI agent, testified that, in November 2008, he assisted in an investigation involving the Defendant. Agent Legg said that, during the course of the investigation, a black Kia was recovered at a detail shop in Oak Ridge. Agent Legg recalled that the car was "spotless" when recovered on November 10, 2008, three days after the shooting. The detail shop's records indicated that Autumn Hale, a friend of the Defendant's, brought the car to be detailed. Based upon further investigation, Agent Legg learned that the Kia was to be sent to Atlanta and shipped to Italy where Autumn Hale's husband, a member of the armed forces, was stationed.

Dan Friel, a Tennessee Bureau of Investigation ("TBI") special agent, testified that he assisted in an investigation involving the Defendant. Investigator Friel recalled that, on November 10, 2008, he executed a search warrant at 109 East Drive, Kingston, Tennessee. Investigator Friel said that the home at this address belonged to the Defendant's mother, Mary Costello, and authorities believed the Defendant was living at his mother's home. Investigator Friel identified a TBI property release form that documented the items found during the execution of the search warrant, including a Motorola AT & T wireless cellular phone and a pair of Nike shoes.

Judy Morris, an AT & T area manager, testified that the company keeps records on all cellular phones and the usage in the ordinary course of business. Morris identified the AT & T cellular phone records submitted for a prepaid phone which included the location of the cell tower site used to connect the calls. The prepaid phone information requested was for the phone police recovered from the Defendant's mother's home. The subscriber information for the cellular phone number 865–851–3032 was "Cody Coser" with an address of "Preston Road in Dallas, Texas." Morris agreed that because identification is not required to set up a prepaid phone the information provided is unverified.

Eric Tyrell, a Sprint Nextel Telecommunications supervisor, testified that the company maintained phone records that included subscriber information, cell sites, call detail records which document incoming and outgoing calls for an account, and text message content. Tyrell explained that the company had various locations with

cell sites to transmit phone calls. Tyrell said that, when a phone call is placed, the company network assesses the call to find the cell site with the strongest signal to connect to the Sprint Nextel phone. Although the strongest cell site, due to terrain or weather, may not be closest, generally the closest cell site is used to transmit the calls. Tyrell identified records his company provided in response to a legal demand in this case.

Robert Moelter, a Verizon Wireless facility manager, verified that the Verizon wireless records pertaining to the trial were maintained through the normal course of business. Moelter testified that the company keeps records of all cellular phone calls made, the cell tower used to process the call, the originating and destination number and text messages. Moelter explained that, usually, the closest cell tower to the Verizon phone user is the cell tower that processes the call.

Jeff Slayton, a Cumberland County Sheriff's Department investigator, testified that he assisted in the homicide investigation related to the Defendant. Investigator Slayton testified that, on the night of November 7, 2008, he responded to a "shots fired" call near Crab Orchard. When Investigator Slayton entered the residence, he observed Patton lying on the floor, conscious and breathing, with his eyes open. Patton appeared to have sustained multiple gunshot wounds. Several individuals were gathered around Asher attempting to stop his bleeding. Investigator Slayton said that he immediately went to the other end of the residence to make sure no shooters were still inside the home. After determining the shooters were not in the residence, Investigator Slayton returned to the Sheriff's Department to prepare a search warrant for the residence.

Investigator Slayton testified that Josh Hutson was the first to be apprehended as a suspect in this case. Hutson was found a short distance from the crime scene and was wet, dirty, and missing one shoe. Two cell phones were found on Hutson's person when authorities took him in to custody. A mask "with a definite pattern" was also found "very near" Hutson when he was apprehended. Investigator Slayton said that, once search warrants for the phones were obtained, he was able to retrieve phone information from the cell phone companies. Based upon this information, he learned that the subscriber for one of the cellular phones was Ashley Snow, Alexander Carino's girlfriend, and the subscriber for the other phone was Josh Hutson. Investigator Slayton said that the phone number assigned to Ashley Snow appeared in the "Contacts" section of Josh Hutson's phone under the name "Reno." Authorities also learned that Snow was the assigned subscriber for two cellular phones. Based upon this information, Investigator Slayton said that he suspected that Alexander Carino was the one who actually used the cellular phone for which Ashley Snow was the subscriber.

Investigator Slayton testified that in the Contacts section of Josh Hutson's cell phone there was a phone number, 865–851–3032, listed for a "Cody C." The same phone number was listed in Carino's cell phone contacts under the name "Cofer." The subscriber information provided from the phone company identified "Cody

Coser" as the subscriber for this cell phone number and was associated with the cellular phone that police recovered from the Defendant's mother's residence. Police also recovered a cell phone from Amanda Spence, and the subscriber information indicated Spence was the subscriber.

Investigator Slayton testified that Special Agent Brad Neeland and Lieutenant Investigator Casey Cox interviewed Hutson the night of the shooting and, at some point, Hutson requested an attorney. After an attorney was appointed, Hutson gave another statement. Investigator Slayton said that, as frequently occurred in his work with defendants, Hutson was not initially truthful. Hutson omitted or changed certain facts in his statement. The same occurred with Spence in that she initially withheld information.

On cross-examination, Investigator Slayton testified that, although Hutson initially denied participation, he later identified "some people that might have been involved," one of whom was Amanda Spence. Spence was then taken in to custody, and she also provided information. Through interviews with these two suspects, authorities became aware that Carino and the Defendant might be participants in the shooting. As the investigation progressed, Spence, Hutson, and Carino began cooperating with the authorities. Hutson ultimately admitted to the possession of a .22 caliber gun on the night of the shooting, but he stated that he disposed of the weapon. Investigator Slayton agreed that the .22 caliber gun was never found.

Investigator Slayton testified that Patton "was known to deal in marijuana or sell marijuana or use it." Investigator Slayton did not recall whether marijuana was found in the residence when authorities executed the search warrant. He did recall the recovery of "at least" a thousand dollars during the search.

Dr. Feng Li, Senior Associate Medical Examiner for Davidson County, testified that his office performed autopsies for Cumberland County. Dr Li said that he performed Asher's autopsy and found gunshot wounds to the chest with injury to the major branch of the major artery and the top of the left lung. A "small fragment of jacket" was recovered during the autopsy, but a bullet was not recovered because the bullets both entered and exited Asher's body. Dr. Li testified that the gunshot wound was fatal and the manner of death was homicide.

Dr. Darinka Mileusnic–Polchan, the Chief Medical Examiner for Knox and Anderson counties, testified that she performed an autopsy on Patton's body. Dr. Mileusnic–Polchan found a total of eight gunshot wounds. Some of these wounds were caused by small caliber bullets, while at least one gunshot wound was due to a large caliber bullet. A small caliber bullet was retrieved from Patton's back, and a "deformed" large caliber bullet was retrieved from the pelvic area. Another small caliber bullet was recovered from Patton's buttocks. Dr. Mileusnic–Polchan testified that the cause of death was multiple gunshot wounds.

Robert Royse, a TBI Forensic Scientist, testified that he assisted in the investigation involving the Defendant. Agent Royse explained that he reported to the scene and identified and recorded physical evidence. Multiple .40 caliber Smith and Wesson cartridge cases were recovered in Patton's living room. Additionally six .223 round cartridge cases were recovered. Agent Royse testified that this type of ammunition is associated with assault-type rifles. The shell casings were recovered "a little bit all over the place" in the living room and in the kitchen. Agent Royse explained that this distribution was because semi-automatic or fully automatic firearms eject fired cartridge cases to the right and slightly to the rear.

Agent Royse testified that he tested the Smith & Wesson .40 caliber pistol recovered in this case and examined the three .40 caliber cartridge casings recovered from Patton's home, and the bullet fragments recovered during the autopsy of Patton's body. Based upon his examination and testing, he determined that the cartridge casings recovered from Patton's home and the bullet fragments recovered from Patton's body were all fired through the barrel of the Smith & Wesson .40 caliber pistol. Agent Royse also identified a Norenco Model BWK92 S porter Carbine, commonly referred to as an AK47. Agent Royse testified that the six .223 cartridge casings recovered from the crime scene as well as the bullet fragments collected during the autopsy from Patton's body had been fired from the assault rifle.

On cross-examination, Agent Royse agreed that five bags of money, totaling approximately $2,500, and one pound of marijuana were also recovered during the search of Patton's residence.

Wilson White, a Cumberland County Sheriff's Department Correctional Officer, testified that he worked in the jail, caring for inmates. Officer White recalled one day when he was assigned to the "tower," or the central control of the maximum security area that provided a clear view of all fifty-two inmates. Officer White identified an incident report that he drafted on April 5, 2009, at 6:15 a.m. The report detailed an incident that occurred immediately after breakfast when inmates brought their food trays out of their cells and placed them on a cart. Officer White observed Carino bring his tray out of his section and the Defendant squat down and slide a piece of paper into the hallway. After Carino placed his tray on the cart, he bent down and picked up the piece of paper that the Defendant had slid into the hallway and then returned to his cell. Officer Wilson instructed another correctional officer to retrieve the paper from Carino. Officer White testified that he recognized the paper the officer retrieved as the one he saw the Defendant push out in the hallway because the paper had a torn corner. When he opened the paper, it contained all numbers. He gave the paper to Sergeant Millsted.

Officer Wilson confirmed that, from the time the Defendant slipped the note outside of his cell to the time that the correctional officer took the paper from Carino, the paper was visible to him, except for when Carino passed through a doorway that

obstructed his view for "[t]wo seconds at the most." Officer Wilson said that the correctional officer retrieved the paper "within a minute" of entering Carino's cell.

Lisa Bilbrey, a Cumberland County Sheriff's Department correctional officer, testified that she interpreted a code contained in a letter passed from the Defendant to Carino. Officer Bilbrey identified the letter she decoded and explained for the jury the process of deciphering codes. Officer Bilbrey read the deciphered note for the jury as follows:

> [M]an, did you not hear, they have nuttin on da car, it was clean. It wasn't up here, who went in the crib with dude, no witnesses saw a car there. The police know girl was in the area, tried to pick dude up. What's girl's name when was at Amanda's? Dud girl don't know if I came up here or not. Some witness say a nigga was in the house. Did you put the clip in the little strap? You gotta know. Did you have any text in your phone? I trashed mine. They can't place, prove I had my phone. Witnesses saw two, they think three, but not for sure. Did you get back your motion of discovery? Answer all my questions. Do you think you put the clip in that, then handed it back?

On cross-examination, Officer Bilbrey testified that she did not know who wrote the code.

Tommy Calahan, a TBI agent, testified that he responded to a call, on the night of November 7, 2008, at Patton's residence in Crab Orchard. Upon his arrival, he found that the victim's bodies had been removed and the crime scene secured. Agent Calahan said that he quickly assessed the crime scene and determined that he would need substantial assistance due to the involvement of two shooters, the use of two different types of guns, and the multiple witnesses. A "Violent Crimes Response Team" was sent to help expedite the investigation and allow Agent Calahan to begin the process of interviewing witnesses. Agent Calahan said that, because investigators were not sure exactly who was involved in the perpetration of the crime, a search warrant for Patton's residence was obtained.

Agent Calahan testified that Hutson was soon taken in to custody and made a few statements but then requested an attorney. Agent Calahan said that Hutson's initial statements were not true. Agent Calahan recalled that on Sunday night, November 9, he interviewed Daniels. Daniels told investigators that Hutson was involved in the crime, and she detailed her activities from November 7 through the early morning hours of November 8.

Agent Calahan testified that, after interviewing the parties, he obtained cellular phone records. He also submitted the cellular phones of the Defendant, Carino, Hutson, and Spence to TBI Technical Services for forensic analysis. Agent Calahan identified photographs taken at a location between Knoxville and Oak Ridge of burnt tennis shoes, which corroborated Daniels' statements to investigators.

Agent Calahan identified a document containing text message communication between Spence, Carino, and the Defendant. A text was sent at 11:29 a.m. on November 7, 2008, from Carino to Spence stating, "wake up, I need you to go see about them dogs 'n shit." This message appeared in both Carino's and Spence's cell phone records. Based upon the investigation, Agent Calahan believed the reference to "dogs" was in relation to Patton owning dogs. On the same date, at 12:04 p.m., Carino sent a text message to the Defendant stating, "We driving the Explorer up there?" Agent Calahan explained that the Defendant owned an Explorer. At 12:05 p.m ., Carino sent another message to the Defendant that stated "it's big enough to fit bags?" Agent Calahan said that he believed Carino was asking about the gun bags. At 3:04 p.m., Carino sent another text message to the Defendant, stating "you find a car." Agent Calahan explained that he believed this to be a reference to the black, four-door Kia. The next text was a response to Carino's text message and was sent from the Defendant's phone to Carino stating, "I think so, hold on." Forty-six minutes later, another text message was sent from the Defendant's phone to Carino that said, "They got to clean out the car and I gotta total it or hide it." Agent Calahan believed this referenced what would happen to the car after the robbery. Agent Calahan said that the black Kia was found the following Monday morning after the Friday night robbery at a detail shop in Oak Ridge.

Agent Calahan testified that the next text message was one sent from Carino's phone to the Defendant asking "where you at." A response from the Defendant's phone was sent at 3:52 p.m., stating "Da Ridge." A text message was sent from Carino's phone to Spence's phone at 3:53 p.m., stating "you need to go check everything out, I'm coming out dar tonight." A response was sent from Spence's phone at 3:55 p.m., stating "Dude ain't home that takes me there, they out of town til Monday, UMMA DO ME." Agent Calahan explained that "UMMA DO ME" was Spence's "signature blog" and appeared at the end of all of her messages. Agent Calahan said that it appeared that Spence made an excuse to Carino about why she could not check out Patton's home as he requested. The next message was sent at 3:56 p.m. from Carino's phone to Spence's phone and stated, "well, go drive down there and look and see what you can see." A return text message from Spence's phone to Carino's phone stated, "K. UMMA DO ME." At 4:09 p.m., a text message was sent from Carino's phone to the Defendant's phone, stating "here I come, don't be bullshitting, cuz." Immediately after that, a message was sent from Carino's phone to Spence's phone that said, "You need to go make sure he's home." A response message from Spence's phone to Carino's phone stated, "I'm working on it." An hour later, a text message was sent from Spence's phone to Carino's phone that said, "You straight, dude is there alone and I guess the dogs are inside and no one there but him." An hour later, a text message was sent from Carino's phone to Spence's phone that stated, "Answer da phone, I'm here." A response was sent from Spence's phone, "I'm bout to come over the bypass, UMMA DO ME." Agent Calahan said these text messages were consistent with the information Spence

provided to investigators that she was not at home when Carino, the Defendant, and Hutson arrived.

Agent Calahan testified about text messages that were sent after the shooting. He said that these messages occurred primarily between Spence and the Defendant, who Spence had just met. Agent Calahan said that Spence told investigators that she did not know the Defendant's cell phone number until she received a phone call that night from an unknown number that she learned was the Defendant's number when she answered the phone call. Agent Calahan confirmed that the Defendant's cell phone number was not in Spence's list of contacts on her phone. The text messages between the Defendant's cell phone and Spence's cell phone began after the Defendant placed a phone call to Spence, which occurred after the shooting. At 10:39 p.m., a text message was sent from Spence's cell phone to the Defendant's cell phone, stating "Tell Reno to call me, UMMA DO ME." Agent Calahan said this text is significant in that Hutson had Carino's cellular phone. At 3:10 a.m. on November 8, a text message was sent from Spence's cellular phone to the Defendant's cellular phone stating, "Hey, they got dude under investigative hold 'til Monday."

Agent Calahan testified that he also compiled a record of actual calls. Agent Calahan identified a phone call between Hutson and the Defendant at 2:29 p.m. on November 7, 2008. The location of the cell tower used to connect the Defendant's call was in Oak Ridge, Tennessee. Agent Calahan said that this was consistent with the Defendant's text message at 3:52 p.m. to Carino that indicated he was in "Da Ridge." Agent Calahan testified that an incoming phone call at 4:09 p.m. from Hutson's cell phone indicated use of the Oak Ridge Tower, which showed the Defendant's continued presence in Oak Ridge. Agent Calahan noted that Autumn Hale, who owned the black Kia, lived in Oak Ridge. Agent Callahan summarized the contents of the cellular phone call records, explaining that few calls were placed before the homicide and the "cell phones [went] crazy" among the relevant parties after the homicide.

Agent Calahan testified that the first phone call placed from the Defendant's cellular phone after the shooting was to Carino's cellular phone, which was in Hutson's possession. After the phone call to Carino's cellular phone, there were two phone calls placed to Spence's cellular phone. The cell phone tower used to connect the call for the Defendant's phone was located in Crab Orchard, Tennessee. Phone calls continued to be placed and received from the Defendant's cellular phone, and the records indicated that the cell towers used included those in Crab Orchard, Ozone, Futrell Lane, Rockwood, Kingston, and Oak Ridge. Agent Calahan said that the record of the cell towers used indicated that the Defendant left Crab Orchard after the shooting and traveled to Oak Ridge and Knoxville. Agent Calahan also noted that the records showed a "dead time," with no phone usage for thirty-eight minutes, from 8:55 p.m. to 9:33 p.m., which is the time frame of the homicides.

Agent Calahan testified that, based on his investigation, he suspected that the weapons might be located in or along the Clinch River, which runs between Cumberland County and Oak Ridge. Agent Calahan identified the Smith and Wesson .40 caliber pistol and the Nato .223 caliber assault rifle, which were recovered within feet of each other in the Clinch River, below the Highway 58 bridge. TBI testing confirmed that these two weapons were used in the homicides.

*State v. Cofer*, No. E2011-00727-CCA-R3CD, 2012 WL 3555310, at *1–14 (Tenn. Crim. App. Aug. 20, 2012), *perm. app. denied* (Tenn. Dec. 10, 2012) ("*Cofer I*").

On November 18, 2010, a Cumberland County jury convicted Cofer of two counts of felony murder and one count of attempted especially aggravated robbery [Doc. 1 p. 1]. At sentencing, Danny Williams, a Board of Probation and Parole officer, testified that Cofer made the following statement during Williams' preparation of the investigative report for sentencing: "I let someone use my phone and they were involved in the crime of robbery and murder. No involvement, but my cell phone." *Cofer I*, 2012 WL 3555310, at *14. Williams also testified that Cofer's criminal history consisted of two convictions for driving without a valid license, an evading arrest conviction, driving on a suspended license conviction, a criminal impersonation conviction, a disorderly conduct conviction, and two misdemeanor convictions for marijuana possession. *Id.* Williams stated that Cofer's record also indicated that he had three probation violations that had been dismissed, and that at the time of the instant offenses, he was out of jail on bond for the sale and delivery of marijuana in Knox County. *Id.* Terrye Patton, Patton's sister, read her victim impact statement at the sentencing hearing. *Id.*

The trial court imposed consecutive life sentences for the felony murder convictions, ordering those sentences to run concurrently with the twelve-year sentence it imposed for the attempted especially aggravated robbery conviction. *Id.* at *1. The Tennessee Supreme Court denied Cofer's application for permission to appeal on December 10, 2012. *Id.*

On June 26, 2013, Cofer filed a pro se petition for post-conviction relief, which he amended on August 21, 2013 [Doc. 13-26 p. 5-8, 10-30]. On December 9, 2013, Cofer filed a second amended petition, this time with the assistance of counsel [*Id.* at 46-82]. Through these pleadings, Cofer argued that he received the ineffective assistance of counsel at trial and on direct appeal [*Id.* at 60-81]. An evidentiary hearing was held on the post-conviction issues, and the TCCA summarized the issues and evidence presented at hearing as follows:

> At the post-conviction hearing, Anna Claire Daniels testified, in large part, consistently with her testimony at trial. She stated that she began dating Joshua Hutson in 2004 and that they ended their relationship a few weeks before the Petitioner's trial in November 2010. Daniels said that Hutson did not provide her with many details about his plans for the evening of November 7, 2008. It was her understanding that some people in Cumberland County owed Carino and the Petitioner money from a bad drug deal, and the two men needed Hutson's help. She acknowledged that the plan involved robbing someone of drugs and money.
>
> Daniels agreed that she dropped Hutson off at the Taco Bell in Oak Ridge that afternoon and that she drove to the BP gas station in Solway at around midnight. She explained that the BP station was located between Oak Ridge and Knoxville and that she went there expecting to pick Hutson up. She said that Carino and the Petitioner placed items in her car, though she did not know what the items were. At the time, Daniels was concerned about Hutson's whereabouts. However, Carino would not disclose what had happened despite her repeated questioning. She said she let Carino out of her car at a baseball field in Karns because he was very anxious and was ordering her to do things. She turned her car around as instructed, and she denied knowing that Carino intended to destroy certain items. When Daniels asked Carino why his shoes were burning, he remained vague and just repeated that something bad had happened. She later learned that he was trying to destroy evidence related to a double homicide. She said that she testified truthfully at trial and that she answered the questions that were presented.
>
> Daniels agreed that she did not testify at trial about going into the BP gas station that night and purchasing lighter fluid. She said that Carino and the Petitioner had ordered her to do so, and she did not recall the purchase until she read some transcripts. She was not asked about the lighter fluid at trial, and she was not interviewed by trial counsel or an investigator from his office. Daniels testified that she did not know that the lighter fluid would be used to burn shoes or other evidence. She stated that trial counsel never asked her about a surveillance video from the BP station. After viewing the surveillance video, Daniels could not identify herself. She said that her memory would not have been refreshed if she had been shown the video in 2008. She further stated that if trial counsel had interviewed her, she would have been truthful regarding what she was able to recall.

17

Daniels said that prior to the post-conviction hearing, no one had ever questioned her about the lighter fluid.

Trial counsel testified that he began practicing law in 1981 and that he focused primarily on criminal defense. In the past decade, he had practiced mostly in court-appointed murder cases at the state level. When he was appointed to represent the Petitioner in 2008, trial counsel had tried about eighteen murder cases. He said that in this case, he had the assistance of co-counsel and two investigators. Trial counsel stated that he personally interviewed four or five witnesses. He could not recall the names of the individuals that his investigators had interviewed. He agreed that eyewitnesses at the Patton residence were unable to identify the three perpetrators. Counsel stated that the theory of the defense was that the State lacked any direct or corroborating evidence to establish the Petitioner's identity as the second intruder in the home invasion.

Trial counsel said that he was aware that Anna Claire Daniels was an important witness for the State and that she would testify at trial. He argued at trial and on appeal that Daniels should have been declared an accomplice as a matter of law and that her testimony required corroboration. He testified that he remained disappointed that he could not convince the courts of his position. Trial counsel stated that the fact that Daniels bought lighter fluid "would not have hurt" his theory that she was an accomplice. He said that the State provided him with the BP surveillance video, but he could not recall whether the Petitioner appeared in the video. He did not want the jury to see the Solway BP video and conclude that the Petitioner was present that evening. Trial counsel recalled that his investigators interviewed the BP clerk. He said he did not interview Daniels because he already had her police statement. Trial counsel opined that Daniels's statement was critical evidence and that her testimony and recollection tended to minimize her own involvement. He testified that his decision not to interview Daniels was "tactical" and not based on neglect, and he explained his strategy as follows:

> As to not interviewing her, I had her written statement, I knew she was going to minimize what she had to say and I'd rather the jury hear from her on direct to minimizing and then use her statement, plus use Mr. Calahan as rebuttal to show that she had every incentive to minimize her involvement. Because I felt very strongly that the court was not going to declare her as an accomplice as a matter of law simply because she was not charged.

Trial counsel said he knew that Daniels went into the BP store and that the defendants used an accelerant. He did not know whether his cross-examination of Daniels would have been more effective if he had known that she had purchased lighter fluid. He disagreed that Daniels' BP purchase was "the most significant piece of evidence" to establish her status as an accomplice. He believed that her prior awareness of the criminal conduct was the most critical factor.

Trial counsel acknowledged that Hutson was represented by counsel who was also representing the Petitioner on a separate charge in Knox County. He was aware that Hutson's counsel and the Petitioner had discussed the instant case. According to trial counsel, Hutson made a statement inculpating the Petitioner before Hutson's counsel was appointed to represent Hutson. Hutson's counsel represented Hutson from November 2008 to July 2009, and a different attorney represented Hutson at trial. Trial counsel said that he had several in-chambers discussions in General Sessions Court about this conflict of interest. Hutson's counsel stated that he sought an opinion from the Board of Professional Responsibility, and the case "languished for two or three months" while they awaited the outcome. Trial counsel said he believed that there was "an out and out conflict" but he was willing to wait for formal guidance. He had prepared a written motion raising the conflict of interest, which he sent to Hutson's counsel. However, trial counsel did not file that motion. He said he adopted the motions filed by Carino's counsel, including a motion to disqualify Hutson's counsel.

Trial counsel agreed that the handwritten coded note retrieved at the Cumberland County Jail was a significant piece of evidence for the State. He stated that he "strenuously tried to keep this [evidence] out" and objected on numerous grounds to its admission at trial. Counsel recalled that after his objection based on lack of foundation, the State "cured" the objection when the correctional officer testified that he personally observed the Petitioner pass the note to Carino. He said that his objections were overruled when he renewed them. He acknowledged that he filed a motion for new trial arguing that the coded note was improperly introduced into evidence and that the note failed to corroborate any accomplice testimony. Trial counsel said that it was his practice to raise as many grounds as possible to preserve issues for appeal. However, he did not include issues from the motion in the appellate brief if they were insignificant. He said that co-counsel handled the appeal, and the issue of the coded note may have been inadvertently omitted. He acknowledged that he signed the appellate brief as counsel of record. He believed that the defense selected and pursued the strongest arguments on direct appeal.

Trial counsel identified a motion to withdraw that he filed about two weeks before the Petitioner's trial. He testified that at the time of the motion, his relationship with the Petitioner had deteriorated to the extent that he could not effectively represent the Petitioner. Trial counsel said that "there was a significant change" in their relationship after he filed the motion and before the trial date. He stated that his difficulties with the Petitioner "evaporated" after the Petitioner stopped "receiving advice and information from third parties."

Trial counsel testified that he personally filed three or four motions on the Petitioner's behalf, and he adopted the motions filed by Carino's counsel. He acknowledged that he largely deferred to the motion practice of Carino's counsel and that he did not spend much time on the motions in this case. He agreed that there were differences in the representation of the Petitioner and of Carino. Trial

counsel stated that the "main motion" he filed was a request for the State to identify corroborating evidence.

Trial counsel said that the State initially sought the enhanced punishment of life without parole for the Petitioner. As a result, the trial court approved funding for a mitigation expert to present proof in the penalty phase. After voir dire, however, the State approached trial counsel and offered to withdraw its notice of intent to seek enhanced punishment if counsel refrained from emphasizing Carino's plea deal or his status as "the ring leader." Trial counsel testified that he consulted the Petitioner and his family, and they agreed to accept the State's offer. He said he did not regret this trial strategy. He acknowledged that he did not present mitigation evidence at the Petitioner's sentencing hearing. Counsel opined that trial courts rarely align murder sentences concurrently to avoid a "free pass" for the second homicide. He said that he raised the issue of sentencing on appeal without the expectation of prevailing.

At the conclusion of the hearing, the post-conviction court denied relief after noting that post-conviction counsel did not present proof to establish prejudice to the Petitioner. The court then supplemented its oral ruling with a written order entered on September 8, 2014. In its order, the court concluded that the Petitioner failed to demonstrate either deficient performance or prejudice arising therefrom. It further noted that "the proof presented by the Petitioner does not cause this court reason to question the jury's finding of guilt beyond a reasonable doubt."

*Cofer v. State*, No. E2014-01844-CCA-R3-PC, 2015 WL 5679844, at *5–7 (Tenn. Crim. App. Sept. 28, 2015), *perm. app. denied* (Tenn. Feb. 18, 2016) ("*Cofer II*"). The TCCA affirmed the trial court's ruling on September 28, 2015, and the Tennessee Supreme Court denied Cofer's application for permission to appeal on February 18, 2016. *Id.*

On or about November 3, 2016, Cofer filed a pro se petition for writ of habeas corpus, raising the following issues, as paraphrased by the Court:

Ground 1:    Cofer was denied the effective assistance of counsel.

        a.    The trial and appellate courts used the wrong standard of review.

        b.    Trial counsel was ineffective for failing to investigate facts and interview witnesses prior to trial.

        c.    Trial counsel was ineffective for failing to properly file a motion challenging counsel's conflict of interest.

      d.      Appellate counsel was ineffective for failing to appeal the issue of the coded note.

      e.      Trial counsel was ineffective in failing to file multiple pretrial motions.

      f.      Trial counsel was ineffective for failing to effectively represent Cofer during sentencing.

Ground 2:      Cofer's convictions are not supported by sufficient evidence.

[Doc. 1]. Respondent was ordered to respond to the petition, and it did so by filing an answer to the petition on April 27, 2017 [Doc. 14]. On July 11, 2017, Cofer, this time with the assistance of retained counsel, filed a reply to Respondent's answer [Doc. 19].

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a State court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the

decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable − a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. This standard will allow relief on a federal claim decided on its merits in State court only where the petitioner demonstrates that the State ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the State court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The doctrine of procedural default also limits federal habeas review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available State remedies, and the State court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a State procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991). A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause and actual prejudice for the default, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Id.* at 750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the State's procedural rules, or that his trial counsel rendered ineffective assistance. *See id.* at 753. Additionally, the prejudice demonstrated to overcome the default must

be actual, not merely a possibility of prejudice. *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (holding prejudice showing requires petitioner to bear "the burden of showing, not merely that errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimension") (emphasis in original). A fundamental miscarriage of justice of occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

## III. DISCUSSION

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

In his federal habeas petition, Cofer claims that he received the ineffective assistance of trial and appellate counsel. Such claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas petitioner to satisfy a two-prong test to warrant federal habeas corpus relief: (1) he must demonstrate constitutionally deficient performance by counsel, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance. *Strickland*, 466 U.S. 668 (1984). Deficiency is established when a petitioner can demonstrate that counsel's performance fell below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687-88. A reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id*. at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id.* at 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

On habeas review, the issue for the district court is not whether the *Strickland* standard is met, but rather, whether the State-court's decision that *Strickland* was not met warrants relief under AEDPA standards. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, when a *Strickland* claim has been rejected on its merits by a State court, a petitioner "must demonstrate that it was necessarily unreasonable" for the State court to rule as it did in order to obtain federal habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

### 1.    Standard of review

Cofer's first claim challenges the standard of review used by the trial and appellate court in adjudicating whether counsel rendered ineffective assistance, arguing that the State courts used an "outcome determinative standard" that was rejected in *Strickland* by requiring Cofer to show that counsel's actions or omissions would have altered the outcome of trial [Doc. 1 p. 5-9].

The *Strickland* standard was used to assess Cofer's claims of ineffective assistance of counsel in State court. *See, e.g., Cofer II*, 2015 WL 5679844, at *8-9. As noted above, *Strickland*'s prejudice prong demands a petitioner demonstrate a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Subsequent Supreme Court cases have reinforced the applicability of *Strickland*'s prejudice analysis except in the rarest of cases, noting that post-*Strickland* cases addressing

ineffective assistance claims do "not justify a departure from a straight-forward application of *Strickland* when the ineffectiveness of counsel" deprives the petitioner "of a substantive or procedural right to which the law entitles him". *See, e.g., Williams v. Taylor*, 529 U.S. 362, 393 (2000) (citing *Nix v. Whiteside*, 475 U.S. 157 (1986) and *Lockhart v. Fretwell*, 506 U.S. 364 (1993)). Therefore, the State courts applied the proper standard, and Cofer's allegation to the contrary does not warrant habeas relief.

### 2.    Investigation of witnesses

Petitioner argues that trial counsel performed ineffectively in failing to investigate and interview Anna Claire Daniels prior to trial, maintaining that had counsel discovered her purchase of lighter fluid that was used to destroy evidence, she could have been indicted and declared an accomplice as a matter of law at trial [Doc. 1 p. 13-14]. Such a declaration was critical, Cofer argues, because had Daniels been declared an accomplice, her testimony could not have been used to corroborate the otherwise circumstantial evidence that Cofer participated in the crimes [Doc. 19 p. 28]. Cofer argues that without her testimony, a reasonable probability of acquittal exists because no other independent evidence was offered to establish Cofer's identity [*Id*. at 29].

Cofer raised this issue in his post-conviction appeal, and the TCCA noted that the trial court had instructed the jury that Daniels' role in the robbery was a question of fact for the jury's determination, and it found Daniels' and the co-defendants' testimonies corroborated by Cofer's cell phone records and the jail-house note he passed to Carino. *Cofer II*, 2015 WL 5679844, at *9-10. Therefore, the TCCA found the record supported the trial court's determination and concluded that Cofer had not demonstrated trial counsel performed deficiently in failing to interview Daniels. *Id*. The court otherwise noted:

> The Petitioner argues that had trial counsel interviewed Daniels, he would have discovered that Daniels purchased accelerant on the night of the offense. However, trial counsel aggressively argued that Daniels should have been classified as an accomplice as a matter of law based on other compelling evidence including her

prior awareness that a crime was about to occur, her involvement as the driver for the co-defendants after the double homicide, and her witnessing the destruction of evidence. While Daniels'[] purchase of the accelerant was certainly relevant to establishing her accomplice status, given the other evidence concerning her involvement, we cannot say that its omission would have altered the outcome of the trial. Accordingly, the Petitioner has failed to establish deficient performance or prejudice arising therefrom. He is not entitled to relief.

*Id.* at *10.

Under Tennessee law, a conviction cannot be based "solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citation omitted).[1] However, the corroboration rule is satisfied even where corroboration evidence is slight; it need only "lead[] to the inference" that a crime has occurred and that the defendant is implicated in it. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). "Whether sufficient corroboration exists is a determination for the jury." *Id.*

The record supports the conclusion that Cofer's jury was instructed regarding whether Anna Claire Daniels was an accomplice as a matter of fact [Doc. 13-13 p. 43-44]. Trial counsel testified at the post-conviction hearing that he chose not to interview Daniels prior to trial because he had her statement to police and did not want to give her the benefit of knowing what he was going to ask her at trial, which is a reasonable, tactical decision entitled to deference. *See Strickland*, 466 U.S. at 490. Additionally, Cofer has not demonstrated that Daniels' testimony regarding the accelerant, if it had been offered, would have altered the outcome of the proceedings. Moreover, Therefore, the Court finds that Cofer has not demonstrated that the TCCA's decision rejecting this claim was contrary to or an unreasonable application of *Strickland*, nor that it was

---

[1] The Court notes that Tennessee's corroboration rule is a State-law rule and not one of constitutional magnitude. *See United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir.1985) (rejecting a sufficiency-of-the-evidence challenge, holding that "the uncorroborated testimony of an accomplice may support a conviction under federal law").

based upon an unreasonable determination of facts in light of the evidence presented to the State court. Cofer is not entitled to relief on this claim.

### 3. Motion challenging counsel's conflict of interest

Cofer next claims that trial counsel was ineffective in failing to file an independent motion challenging the conflict of interest of attorney Kevin Angel, who simultaneously represented Hutson and Cofer for a period of time in November 2008 through July 1, 2009 [*See* Doc. 1 p. 14-18]. Cofer argues that he had spoken with Angel about the instant case prior to Angel making an appearance for Hutson, and that Hutson thereafter benefitted from speaking to law enforcement first and claiming to be the individual outside the Patton residence [*See* Doc. 19 p. 30]. Moreover, he claims, the factual version of the offense presented at trial and later relied upon by the Tennessee courts was largely based on Hutson's accomplice testimony [*Id.*].

Cofer raised this issue in his post-conviction appeal, where the TCCA determined that Cofer had failed to demonstrate that Hutson's counsel "was burdened by an actual conflict of interest." *Cofer II*, 2015 WL 5679844, at *11. The TCCA noted:

> Trial counsel testified at the post-conviction hearing that he had several in-chambers discussions regarding the simultaneous representation of Hutson and the Petitioner by Hutson's counsel. During those discussions, counsel told the trial court that he believed there was "an out and out conflict." Although he drafted a motion to disqualify Hutson's counsel, he did not file it because he was willing to wait for an opinion from the Board of Professional Responsibility. He said that Hutson's counsel was no longer representing Hutson at the time of trial. The trial record reflects that during a motion hearing on March 4, 2010, Carino's counsel argued that Hutson's counsel should be disqualified, and trial counsel adopted the motions filed by Carino's counsel. However, the trial court determined that the matter was moot because Hutson's counsel was no longer involved in the case and did not represent any co-defendants. At the post-conviction hearing, the Petitioner did not present any proof to establish a reasonable probability that an independent motion raised by trial counsel would have resulted in a different outcome, therefore he has failed to meet his burden of proof in this claim.

*Id.* at *11. With conflict of interest claims, prejudice is presumed only if the petitioner demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict

27

of interest adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)).

The Sixth Circuit set forth the standard for determining whether an actual conflict of interests exists as follows:

> We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests." ... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." ... There is no violation where the conflict is "irrelevant or merely hypothetical"; there must be an "actual significant conflict."

*Thomas v. Foltz*, 818 F.3d 476, 481 (6th Cir. 1987) (citing *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983)). Accordingly, once a conflict is shown, "the standard still requires a choice by counsel, caused by the conflict of interest." *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004).

In this case, there is no evidence that Attorney Angel operated under an actual conflict. Angel was no longer Hutson's counsel at the time of trial. In fact, the record demonstrates that Attorney Angel was out of the case before Hutson was bound over for trial [Doc. 13-27 p. 115-16]. Additionally, there was no proof presented to the State courts to establish that an independent motion from counsel would have resulted in a different outcome than the motion filed by Carino's counsel. Therefore, the Court finds that Cofer has not demonstrated that the TCCA's decision rejecting this claim was contrary to or an unreasonable application of *Strickland*, nor that it was based upon an unreasonable determination of facts in light of the evidence presented to the State court. Cofer is not entitled to relief on this claim.

### 4.    Coded note

Cofer asserts that his appellate counsel was ineffective in failing to challenge the admission of the coded note on direct appeal, as there was no testimony establishing who wrote the note, and

Agent Calahan's testimony regarding its contents was purely speculative [Doc. 1 p. 18-22]. He further claims that trial counsel conceded at the post-conviction hearing that his omission may have been inadvertent rather than tactical [*Id.*].

In rejecting this claim on post-conviction appeal, the TCCA found that Cofer had failed to establish that counsel's failure to challenge the coded note on direct appeal was prejudicial, noting that where a petitioner faults counsel for failing to raise an issue on appeal, the reviewing court should consider the merits of the issue. *Cofer II*, 2015 WL 5679844, at *11-12. The TCCA noted that Officer White testified that he personally observed the exchange of the note between Cofer and Carino, and that the note was immediately retrieved from Carino and brought to him, where Officer White was able to identify the note because of its torn corner. *Id*. at 12. Therefore, the TCCA found, "the facts and circumstances surrounding the coded note reasonably established its identity and integrity," and Cofer failed to show he suffered prejudice due to counsel's failure to challenge the note's admission on appeal. *Id*.

A review of the record supports the TCCA's recitation of Officer White's testimony [*See* Doc. 13-10 p. 89-99]. Moreover, the admissibility of the note was addressed both at trial and in Cofer's motion for a new trial [*Id*. at 96; Doc. 13-15 p. 6]. Cofer has failed to establish that the outcome on appeal would have been different than the other times the motion was considered. Accordingly, Cofer has not demonstrated that he was prejudiced by counsel's failure to raise this issue on appeal. Therefore, the Court finds that Cofer has not demonstrated that the TCCA's decision rejecting this claim was contrary to or an unreasonable application of *Strickland*, nor that it was based upon an unreasonable determination of facts in light of the evidence presented to the State court, and he is not entitled to relief on this claim.

### 5.    Pretrial motions

Cofer contends that trial counsel was ineffective for failing to file multiple pretrial motions, including suppression motions, a judgment of acquittal based on insufficient corroborating evidence, and a motion to dismiss based on invalid arrest warrants [Doc. 1 p. 22-25].  He also claims that post-conviction counsel failed to thoroughly present this claim at the post-conviction hearing, and that post-conviction counsel's poor presentation of this issue should warrant a hearing on the merits of whether trial counsel filed adequate pre-trial motions [*Id.*].

On post-conviction appeal, the TCCA noted that Cofer had failed to demonstrate how he was prejudiced by his trial counsel's motion practice, as he did not present any proof or argument at the evidentiary hearing "to establish a reasonable probability that the filing of the Petitioner's requested pretrial motions would have resulted in a different outcome."  *Cofer II*, 2015 WL 5679844, at *13.  Likewise, Cofer has failed in these proceedings to establish how he was prejudiced by counsel's failure to file additional motions, and therefore, cannot demonstrate an entitlement to relief as to this claim.   Therefore, the Court finds that the TCCA's decision rejecting this claim was not contrary to or an unreasonable application of *Strickland*, nor was it based upon an unreasonable determination of facts in light of the evidence presented to the State court.

As far as Cofer's claim may be considered an ineffective assistance of post-conviction-counsel claim for failing to properly present this issue at post-conviction hearing, the Court notes that a freestanding claim that post-conviction counsel was ineffective is not a cognizable basis for federal habeas relief.  *See* 28 U.S.C. § 2254(i) (stating claims alleging ineffectiveness of collateral review counsel are not cognizable habeas claims); *Coleman*, 501 U.S. at 752 ("There is no constitutional right to an attorney in state post-conviction proceedings."); *Wallace v. Sexton*, No. 13-5331, 2014 WL 2782009, at *11 (6th Cir. June 20, 2014) (finding "Supreme Court has not recognized ineffective assistance of post-conviction counsel as a free-standing constitutional

claim"). Therefore, because Cofer's ancillary claim does not present a cognizable basis for federal habeas review, relief is precluded.

### 6. Sentencing proceedings

Cofer contends that trial counsel was ineffective in failing to effectively represent him during sentencing, as he failed to present any mitigating factors or present mitigating evidence [Doc. 1 p. 26-27]. In considering this claim on appeal from the denial of post-conviction relief, the TCCA found:

> Petitioner argues that trial counsel provided ineffective assistance during sentencing. Specifically, he contends that trial counsel should have presented mitigating factors or evidence to support concurrent sentencing; should have objected to the trial court's finding that the Petitioner committed the offenses while on probation; and should have informed the court the reason that the State withdrew its notice of intent to seek enhanced punishment. In rejecting this claim, the post-conviction court found that the Petitioner failed to present any proof of factors that the sentencing court could have considered and that the Petitioner did not demonstrate how counsel's representation was ineffective or deficient during sentencing. We agree that the Petitioner has made an insufficient showing of prejudice based on counsel's performance.

> The record reflects that at the sentencing hearing, the Petitioner did not accept responsibility for the offenses, as shown in his statement in the presentence report: "I let someone use my phone and they were involved in the crime of robbery and murder. No involvement, but my cell phone." *See Cody Cofer*, 2012 WL 3555310, at *14. Officer Danny Williams of the Board of Probation and Parole testified that he interviewed the Petitioner twice, and the Petitioner denied being present during the offenses. At the conclusion of the hearing, trial counsel argued that the court should impose concurrent sentences for the felony murder convictions because consecutive sentencing was akin to life without parole, an enhanced punishment that the State had withdrawn. The Petitioner then challenged his sentences on direct appeal, and this Court affirmed the trial court's imposition of consecutive sentences. *Id.* at *24.

> At the post-conviction hearing, trial counsel testified that funding for a mitigation expert had initially been approved because the State was seeking an enhanced punishment of life without parole. Counsel stated that he consulted the Petitioner and his family and that it was a matter of trial strategy to accept the State's offer to withdraw its intent to seek enhanced punishment. He conceded that he did not present mitigation evidence at the sentencing hearing. Trial counsel further testified that he did not expect to prevail on the sentencing issue on direct appeal.

At the conclusion of the evidentiary hearing, the court specifically questioned post-conviction counsel regarding whether the lack of proof presented by trial counsel prejudiced the Petitioner at sentencing. The following colloquy occurred:

> THE COURT: Ineffective assistance at sentencing, what is the mitigation proof? There is none before this court today. I heard none of what it is that [trial counsel] would have put on in mitigation. If you had called the mitigation specialist, perhaps he would have said to me [the Petitioner]'s eighteen years old at the time, he has an IQ of particular thing, he did this, that, I haven't heard anything about it.
> ....
> I've got no proof in this record that I can rule upon. Bring your witness, bring them to me, show them to me, I don't have any of that. That's the—
>
> [POST–CONVICTION COUNSEL]: [Trial counsel] testified that on appeal he raised three mitigating factors.
>
> THE COURT: And did he raise them when we were sentencing the [Petitioner]?
>
> [POST–CONVICTION COUNSEL]: No.
>
> THE COURT: He raised them to the Court of Criminal Appeals?
>
> [POST–CONVICTION COUNSEL]: Yes.
>
> THE COURT: How would he win, who is it, that proof is not before this court? It wasn't before the Court of Criminal Appeals either. Who is it that testified to the three things that he said, here, today? Do you see what I'm saying? I have to be able to see that if someone had testified to that, the court may have ruled differently. I don't have that testimony.

We conclude that the Petitioner has failed to establish a reasonable probability that but for counsel's alleged errors, the results of the sentencing hearing would have been different. To demonstrate prejudice based on trial counsel's failure to present a mitigation expert, the Petitioner should have presented such a witness at the post-conviction hearing. *See Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008); *see also Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Nor has the Petitioner shown that he was prejudiced by counsel's failure to object to the trial court's finding that he committed the offenses while on probation, given that this Court upheld the separate finding that the Petitioner was a dangerous offender. *See Cody Cofer*, 2012 WL 3555310, at *22–24; *see also* T.C.A § 40–35–115(4). Finally, the Petitioner has not shown that he would have received concurrent

sentences if trial counsel informed the court of the basis of the State's withdrawal of its notice of intent to seek enhanced punishment. Although the Petitioner complains of counsel's representation during sentencing, the Petitioner has not met his burden of proving his factual allegations by clear and convincing evidence. *See* T.C.A. § 40–30–110(f). Accordingly, he is not entitled to relief on this issue.

*Cofer II*, 2015 WL 5679844, at *13–14.

In his federal proceedings, as in his State proceedings, Cofer does not present any evidence of what mitigating evidence his trial counsel should have presented, nor has he established how those factors would have altered the outcome of his sentencing hearing. The Court finds that the TCCA's decision rejecting this claim was not contrary to or an unreasonable application of *Strickland*, nor was it based upon an unreasonable determination of facts in light of the evidence presented to the State court.

Insofar as Cofer's claim is predicated on an allegation that post-conviction counsel rendered ineffective assistance for failure to properly present this issue at the post-conviction hearing, the Court iterates that such a claim is not a cognizable basis for federal habeas relief. *See, e.g.*, 28 U.S.C. § 2254(i); *Coleman*, 501 U.S. at 752. Accordingly, relief on this claim will be denied.

## B.    SUFFICIENCY OF THE EVIDENCE

Cofer argues that the evidence presented was insufficient to support his convictions [Doc. 1 p. 28-30]. The TCCA concluded that the evidence was sufficient to support his convictions of first-degree felony murder and attempted especially aggravated robbery, noting the following:

> The evidence established that the Defendant acquired a black four-door Kia to drive to Cumberland County and rob Patton. The Defendant, Carino, and Hutson, with the assistance of Spence, located Patton's residence. The Defendant, Carino, and Hutson returned to Patton's home with guns to rob Patton of money and drugs that they believed were in Patton's home. The Defendant, who carried a pistol, and Carino, who carried an assault rifle, both wore all black clothing, gloves, and face masks. They entered Patton's home and demanded money. When Patton ordered the men out of his house, the Defendant and Carino began firing in a room full of people, shooting and killing both Patton and Asher. After shooting Patton and

33

Asher, Carino headed to the back of the home while the Defendant went through the kitchen drawers and cabinets. During this time, the Defendant refused to allow Garrison to assist Asher, who was seriously injured. When Reed arrived, the Defendant and Carino fled without money or drugs. Therefore, the evidence was sufficient to establish that the Defendant killed Asher and Patton during the attempt to perpetrate an especially aggravated robbery.

The Defendant does not contest that these crimes were committed, but he argues that the proof of his identity as a participant is insufficient because, he claims, there was no corroboration of the accomplices' testimony implicating him in these crimes. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn.2001). The law in Tennessee regarding accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn.1994) (citations omitted)). Whether sufficient corroboration exists is a determination for the jury. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn.1994).

Amanda Spence and Josh Hutson both testified as accomplices regarding the plan to rob Patton. Hutson testified that he met the Defendant and Carino at a Taco Bell in Oak Ridge, and the three men drove in a black Kia to Cumberland County to rob Patton. Spence also identified the Defendant as present, first, at her apartment and, second, in the black Kia when she took Carino, the Defendant, and Hutson to Patton's residence. Daniels corroborated this testimony. She stated that she dropped Hutson off at a Taco Bell in Oak Ridge, where Hutson met the Defendant and Carino, and they were driving a black Kia. Reed also testified that a black KIA was outside parked in Patton's driveway when he arrived.

Josh Hutson testified that he, the Defendant, and Carino were present during the robbery. He said that all three men were wearing black clothing, masks, and gloves. He said that his mask differed slightly in that it had a design on the lower half of the mask. He described Carino as carrying an AK47 and the Defendant as carrying

a pistol when they entered Patton's home. Initially, Hutson remained outside, but, after hearing gunfire, he ran onto the porch and looked in the house through the door. The Defendant then ordered him back outside to keep watch. Rhinehart corroborated Hutson's testimony. Rhinehart testified that two men entered Patton's residence, dressed in all black clothing wearing masks and gloves. One man carried an AK47 while the other carried a pistol. After the two men fired their guns, a third man appeared in the doorway wearing all black with a mask that had a design. The man carrying the pistol ordered this third man to return outside to keep watch. Further, medical examiner testimony confirmed that bullets from a pistol and assault rifle were found in Patton's body.

Text messages and phone calls were also exchanged between the participants both before and after the murders occurred. Phone calls received and made from the Defendant's cellular phone indicated that these calls were connected through the nearest cell phone tower, which was located in Crab Orchard, Tennessee, the location of Patton's home. This further corroborates the Defendant's presence in the area at the time of the murders. Spence's testimony regarding phone calls between her and the Defendant after the murders was also corroborated by the cell phone records.

Based upon this evidence, we conclude that a rational jury could find the Defendant guilty beyond a reasonable doubt as to each of the counts of first degree felony murder and attempted especially aggravated robbery. Accordingly, the Defendant is not entitled to relief on this issue.

*Cofer I*, 2012 WL 3555310, at *16–18.

A challenge to the sufficiency of the evidence is governed by the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which allows a reviewing court to set aside a verdict on the basis of insufficient evidence only if, "after viewing the evidence in the light most favorable to the prosecution," no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The reviewing court must presume that the trier of fact resolved conflicting inferences of fact in favor of the prosecution and must defer to that resolution, because such a standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Because both the AEDPA and the *Jackson*

standard apply to insufficiency claims, this Court's review is doubly deferential. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

Cofer argues that there is no non-accomplice testimony linking him to the crimes in this case, and that while the evidence might lead to a reasonable speculation that he was involved in the crimes, such testimony is not sufficient evidence to sustain his convictions beyond a reasonable doubt. Specifically, he asserts that Huston is the only witness implicating him in the actual crimes, and even he did not witness the robbery or the shooting [Doc. 19 p. 19]. Cofer further argues that his cell phone records do not corroborate witness testimony, as no evidence was presented to demonstrate he was in possession of the phone at the time the relevant text messages and calls were made [*Id*. at 19-21].

The Court notes that Cofer raises no dispute as to the sufficiency of the evidence to establish that the crimes of first-degree felony murder and attempted especially aggravated robbery occurred. Rather, the issue raised here is the sufficiency of the non-accomplice evidence identifying Cofer as a participant in the crimes. However, there is no federal constitutional requirement that accomplice testimony be corroborated. *See Tackas v. Engle*, 768 F.2d 122, 127 (6th Cir. 1985). Therefore, whether this issue was correctly decided under State law is not cognizable in federal habeas, unless it rises to the level of a due process violation. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Accordingly, the Court considers this claim under the *Jackson* standard, which mandates that "[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original).

At trial, accomplices Amanda Spence and Josh Hutson both identified Cofer as being present during the robbery, and Hutson identified Cofer as the second shooter entering the Patton home [*See* Doc. 13-9 p. 75-83; Doc. 13-11 p. 38-50]. Their testimony was corroborated by Anna Claire Daniels, who identified Cofer as being present when she dropped Hutson off at the Taco Bell in Oak Ridge, and as being present with Carino later in the evening when she went to the BP in Solway intending to pick up Hutson and Carino [Doc. 13-11 p. 6-15].

Additionally, the jury was presented with cell phone evidence of calls and text messages from Cofer's cell phone to the cell phones of Carino, Hutson, and Spence, and "pings" from a tower near the Patton home further corroborated that Cofer was near the scene of the crime at relevant times [*See, e.g.*, Doc. 13-9]. While Cofer contends that there is no proof that he was the individual in possession of his cell phone at the time of the murders, his cell phone was found at his mother's home during the execution of a search warrant a few days later, further corroborating the testimony given at trial [*See* Doc. 13-8 p. 128-137; Doc. 13-9 p. 4-9].

The jury resolved the conflicts in testimony in this case in favor of the State, and there was sufficient evidence presented to establish Cofer as a participant in the crimes. Therefore, the decision rejecting this claim was not contrary to, nor did it involve an unreasonable application of, *Jackson v. Virginia*, nor was it based on an unreasonable determination of facts in light of the evidence presented. Cofer is not entitled to relief as to this claim.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28

U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

## V.      CONCLUSION

Cody Cofer has failed to demonstrate an entitlement to federal habeas relief. Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court will **CERTIFY** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE ORDER WILL ENTER.**

**CHIEF UNITED STATES DISTRICT JUDGE**